In re **BOSTON REGIONAL MEDICAL CENTER, INC., Debtor.**

**The Official Committee of Unsecured Creditors for the Bankruptcy Estate of Boston Regional Medical Center, Inc., Plaintiff,**

v.

**Charles Ricks, DDS, et al., Defendants.**

**No. 01–10572–MLW.**

United States District Court, D. Massachusetts.

Aug. 4, 2004.

Charles R. Bennett, Jr., Harold B. Murphy, Donald E. Jeffrey, Hanify & King,

P.C., Boston, MA, for Plaintiff/Counter–Defendant.

Michael R. Coppock, Rubin & Rudman, LLP, Ian Crawford, Todd & Weld LLP, Alan R. Hoffman, Lynch, Brewer, Hoffman & Fink LLP, William Sopp, Finnegan, Hickey, Dinsmoor & Johnson, P.C., Howard M. Brown, Bartlett, Hackett, Feinberg, Gentilli, Liston, Brown, & Phalen, PC, Boston, MA, David M. Nickless, Nickless & Phillips, PC, Fitchburg, MA, for Defendants/Counter–Claimant/Third–Party Plaintiff.

Howard P. Blatchford, Jr., Jager Smith PC, John V. Snellings, Nixon Peabody, LLP, Boston, MA, for Third–Party Defendant.

Cleora S. Anderson, Thomas O. Bean, Nutter, McClennen & Fish, LLP, Boston, MA, for Cross–Defendant.

## MEMORANDUM AND ORDER

WOLF, District Judge.

## I. INTRODUCTION

This is one of several cases resulting from the bankruptcy of Boston Regional Medical Center, Inc. ("BRMC"). In this proceeding, the Official Committee of Unsecured Creditors for the Bankruptcy Estate of BRMC (the "Committee" or "CredComm") alleges corporate mismanagement and malfeasance by former members of BRMC's Board of Trustees (the "Board Members" or "Trustee Defendants") as well BRMC's former president and Chief Executive Officer, Charles Ricks, and former vice-president and Chief Financial Officer, Frances Crunk. The Committee seeks damages for breach of the duties of loyalty, candor, good faith, and due care. It also seeks damages for breach of contract against Ricks and Crunk. In addition, the Committee alleges that the Atlantic Adventist Healthcare Corporation ("AAHC") aided and abetted the other defendants in their various breaches of fiduciary duty to BRMC and received several million dollars in assets in a manner that was fraudulent as to BRMC's creditors. AAHC, which is a non-profit corporation organized under the laws of Massachusetts, counterclaimed for a declaratory judgment establishing that any tort liability it has to the Committee is capped at $20,000 under M.G.L. ch. 231, § 85K.

Now before the court are three motions for judgment on the pleadings filed by AAHC, Ricks and Crunk, respectively, and three motions for summary judgment filed by the Trustee defendants. For the reasons described below, the court is allowing AAHC's motion in part and denying it in part, allowing the motions of the Trustee defendants, and denying the motions of Ricks and Crunk.

The court concludes that it has subject matter jurisdiction over this case and that the Attorney General of Massachusetts does not have exclusive standing to sue for an alleged breach of fiduciary duty to BRMC. Rather, BRMC could have brought a suit for breach of fiduciary duty before it declared bankruptcy and that cause of action passed to BRMC's bankruptcy estate as a result of the bankruptcy filing. However, as described below, there is a serious question as to whether the Committee, as opposed to BRMC's bankruptcy estate itself, is properly the plaintiff in this case. The court is ordering the Committee to address this question further.

## II. FACTUAL BACKGROUND

For purposes of the motions for judgment on the pleadings, all material allegations in the complaint must be credited in the light most favorable to the Committee. *See United States v. United States Currency, $81,000*, 189 F.3d 28, 33 (1st Cir. 1999). In analyzing the motions for summary judgment, "the court must look at

the record in the light most favorable to the party opposing the motion and must indulge all inferences favorable to that party." *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 928 (1st Cir.1983); *Attallah v. United States*, 955 F.2d 776, 779 (1st Cir.1992); *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990). With one exception, however, the arguments pressed by the defendants at this stage of the litigation do not depend on the strength of the plaintiff's evidence. Rather, they present pure questions of law.[1] Consequently, the following statement of facts is applicable to both sets of motions.

## A. THE PARTIES

BRMC is a non-profit corporation organized under the laws of Massachusetts. It was originally incorporated in 1899. It was founded by and has continuously had close ties to members of the Seventh Day Adventist Church ("the Church"). BRMC had, for some time, been operating an acute-care hospital in Stoneham, Massachusetts. Ricks was BRMC's president and Chief Executive Officer. Crunk was its vice-president and Chief Financial Officer. Both Ricks and Crunk received compensation for their services. In addition to his position as an officer, Ricks was also a member of BRMC's Board of Trustees. Crunk was not a member of the Board. Ricks and Crunk are represented by separate counsel.

The Trustee defendants have formed three groups to defend against the Committee's suit. Trustees Charles Case, Harold Grayson, Theodore Jones, Leon Thomassian and Halvard Thomsen are referred to as "the Case Defendants". Trustees Jon Asgeirsson, Mark Hughes, Randy

Lapides, Robert Leone, Jose Marcal, Kim O'Neil, and Paul Raslavicus are referred to as "the Hughes Defendants". Trustee Laura Hogan has chosen separate representation. The Case Defendants, the Hughes Defendants and Hogan never received compensation for their services as members of BRMC's Board of Trustees.

The final defendant is AAHC. AAHC is a Massachusetts corporation organized to coordinate activities among charitable institutions affiliated with the Church. "The specific purpose of [AAHC] is to accomplish the goals and objectives of the Church in providing the optimum level of health and medical care to the general public." AAHC's Appx. at 87. Members of AAHC's Board of Directors were the sole members of BRMC. Unlike a for-profit corporation, which has shareholders, a not-for-profit corporation in Massachusetts may, but is not required to, have members. The AAHC board members also sat on BRMC's Board of Trustees. They are Ricks and the Case Defendants.

According to its Articles of Organization, BRMC has several purposes. They include: (1) "founding a hospital or charitable asylum within the State of Massachusetts"; (2) "the care and relief of indigent or other sick or infirm persons ....."; (3) "to aid and assist [AAHC] in furtherance of its charitable and corporate purposes, including operation and harmony with the standards, goals and methods established by the Seventh-day Adventist Church"; (4) distributing assets to Church affiliates once creditors are paid in the event of dissolution or liquidation; and (5) "to engage in educational activities for the benefit of the community served by the Corporation." Bennett Aff. Ex. 3.

1. The one exception is whether the plaintiff has established a genuine issue of material fact as to whether certain defendants committed acts intentionally designed to harm BRMC and its creditors. The allegations and evidence relating to this issue are discussed in Part IV.D.3, *infra.*

## B. THE EVENTS LEADING UP TO BRMC'S BANKRUPTCY

At least as of 1994, BRMC had been experiencing significant operating losses and cash flow problems. The Committee alleges that BRMC has been insolvent since at least 1996. In 1997, Ricks began to search for a financial partner to save BRMC from what seemed to be certain demise as a standalone entity. After an aborted attempt to sell a substantial portion of its assets to Doctors Community Healthcare Corporation ("DCHC"), BRMC declared bankruptcy. The DCHC asset purchase agreement was to be financed by National Century Financial Enterprises ("NCFE"). NCFE and its president, Lance Poulsen, owned a substantial stake in DCHC.

The plaintiff alleges that Ricks rejected the advice of his outside advisers and pursued the DCHC offer rather than an alternate offer from Tenet Healthcare ("Tenet") in order to protect the interests of the Church at the expense of BRMC and its unsecured creditors. Among other things, the Committee alleges that one of Ricks' motives for choosing DCHC over Tenet was that Ricks wanted an Adventist church and school operating on BRMC's property in Stoneham to be able to continue to exist.

According to the plaintiff, DCHC failed to make good on its promise to purchase BRMC's assets because NCFE never provided the necessary financing—an outcome that the Board should have foreseen. The plaintiff further alleges that DCHC was mismanaging BRMC's affairs under an intertwined management agreement. According to the Committee, the other Board members were either complicit in Ricks' breach of loyalty and good faith or abdicated their responsibilities as Board members. Indeed, the Committee alleges that the failure of the Board members to prevent BRMC's demise constitutes gross negligence or, with regard to Ricks and the Case Defendants, involved an intent to harm BRMC and its creditors in order to benefit the Church.

The plaintiff also alleges that AAHC and members of its Board of Directors controlled Boston Regional Medical Associates, Inc. ("BRMA"), a not-for-profit corporation that owned and managed various medical practices associated with BRMC. According to the plaintiff, BRMC, despite its operating losses, continued to advance funds to AAHC and BRMA. This further weakened BRMC and its ability to satisfy the significant debts it had incurred.

Pursuant to M.G.L. ch. 180, § 8A(d), BRMC was required to submit the DCHC transaction for review by the Attorney General and, ultimately, for approval by the Supreme Judicial Court. BRMC notified the Attorney General of the proposed transaction, and his office began to investigate it. However, the DCHC transaction fell through before the Attorney General completed his investigation.

On February 4, 1999, after the proposed DCHC sale failed to be consummated, BRMC commenced a voluntary case under Chapter 11 of the Bankruptcy Code by filing a petition with the United States Bankruptcy Court for the District of Massachusetts.

## C. THE BANKRUPTCY PLAN

BRMC successfully proposed and had confirmed a Plan of Reorganization (the "Plan"). The Plan created a new entity, Reorganized BRMC, in which all of the assets of BRMC's bankruptcy estate were vested. Plan §§ 1.32, 5.1. As part of the Plan, all of BRMC's assets would be liquidated. *Id.* § 5.6. Reorganized BRMC has "the right to settle, compromise, sell, assign, terminate, release, discontinue or abandon any [of BRMC's] Cause[s] of Ac-

tion from time to time in its discretion." *Id.* § 13.2

A Liquidating Agent was appointed to liquidate BRMC's assets. *Id.* § 5.4 The Liquidating Agent was appointed by the new Board of Trustees of Reorganized BRMC. *Id.* This three member Board is elected by the Committee. *Id.* § 5.3. The Liquidating Agent does not have the authority to liquidate assets valued in excess of $25,000 without the approval of the new Board of Trustees. *Id.* § 5.6. The new Board of Trustees does not have the authority to approve liquidation of assets valued in excess of $250,000 without the approval of the Committee. *Id.*

As of March 19, 2003, all of BRMC's tangible assets had been liquidated. Bennett Aff. Ex. 1. The only assets remaining in the bankruptcy estate as of that date were cash reserves of approximately $7,300,000 and various causes of action. *Id.* The Estate owed more than $35,000,000 on undisputed, liquidated unsecured claims. *Id.* There are also additional disputed claims amounting to more than $15,000,000, of which approximately $12,000,000 represents unsecured claims. *Id.*

If any assets remain after all of the Estate's administrative costs have been paid and all allowed creditors' claims have been paid in full, the assets are to be transferred to the Southern New England Conference of Seventh Day Adventists. Plan § 5.8.

## III. PROCEDURAL HISTORY

On October 31, 2000, the Committee brought this case as an adversary proceeding in the Bankruptcy Court. The Committee asserts several causes of action. Counts I–III allege claims for various breaches of fiduciary duty against Ricks, Crunk and the Trustee Defendants. Count I alleges a violation of the duties of loyalty and candor. Count II alleges a violation of the duty of good faith. Count III alleges a violation of the duty of care. In Count IV, the plaintiff seeks damages from AAHC and its directors for aiding and abetting those alleged breaches of fiduciary duty. AAHC filed a counterclaim seeking a declaratory judgment that its damages on Count IV are limited to $20,000 under the charitable immunity cap of M.G.L. ch. 231, § 85K.

The remaining counts of the Complaint involve: the Committee's attempt to recover advances that BRMC made to AAHC and BRMA under theories of breach of contract and fraudulent transfer (Counts V–VIII); an alleged preferential transfer to Crunk for relocation expenses (Count IX); and two unpaid loans to Ricks and Crunk (Counts X and XI). Only Counts I–IV are at issue in the motions now before the court.

After service was effected on all defendants, the parties filed various counterclaims, cross-claims and third party claims. The defendants, other than AAHC, counterclaimed against BRMC for indemnification under an officer-indemnification by-law. Several defendants also filed third party claims against NCFE, DCHC and their respective presidents Poulsen and Paul Tuft. Crunk filed a cross-claim against AAHC. Several other defendant trustees, led by Hughes, filed cross-claims against Ricks, Crunk, several other cotrustees, and AAHC.

The Attorney General is aware that this litigation is ongoing. Two Assistant Attorneys General were deposed in this case. However, the Attorney General has not sought to intervene and no party has attempted to join him.

Discovery proceeded in the Bankruptcy Court until this court allowed defendant Laura Hogan's motion to withdraw the reference so the parties could complete

discovery and prepare for a trial in the District Court.

Meanwhile, in a separate adversary proceeding brought by Reorganized BRMC against NCFE, Poulsen, Tuft and others (the "NCFE Action"), Reorganized BRMC, NCFE and Poulsen had reached a settlement agreement. However, the agreement was contingent on Reorganized BRMC obtaining dismissals of all claims against NCFE brought in this case by the Trustee Defendants and an injunction against any new claims for indemnification or contribution by BRMC's former Board members. Some of the Trustee Defendants objected to the settlement, disputing the impact of the settlement on their liability for breach of fiduciary duty under M.G.L. Chapter 231B. Although the Bankruptcy Judge found the settlement to be fair and reasonable, she did not enter an order approving the settlement as she believed she lacked the jurisdiction to do so. Consequently, the parties seeking settlement filed a motion in this court requesting approval.

At a hearing on April 12, 2002, the court ordered that the Bankruptcy Judge conduct a further hearing, and issue factual findings and legal conclusions concerning whether the proposed settlement between BRMC and NCFE, its subsidiaries, and its President Lance Poulsen should be approved and whether the order barring third-party claims against NCFE in this case should be entered. *See* April 12, 2002 Mem. & Order. The court also directed the Bankruptcy Judge to address the following questions: "(1) whether Massachusetts law permits, or requires, that the amount of a pretrial settlement by some defendants be apportioned between different claims (i.e., contract and tort claims) arising out of common facts; (2) in any event, whether, if permissible, such an apportionment is appropriate in the instant dispute; and (3) whether the amount the

plaintiffs have allocated to the tort claims common to the two proceedings is reasonable." *Id.* at 5. The court noted that those findings and conclusions would be subject to *de novo* review by the District Court. *Id.* at 4.

In addition, the court ordered that, by May 30, 2002, the defendants make the disclosures required by Federal Rule of Civil Procedure 26(a)(2) with respect to expert testimony, including disclosure of their experts' written reports, and stayed all other discovery until further order of the Court. *Id.* at 6.

Unfortunately, before the bankruptcy court issued its findings of fact and conclusions of law, NCFE declared bankruptcy on November 18, 2002. DCHC followed suit two days later. These bankruptcy cases are pending in the Southern District of Ohio and the District of Columbia respectively. Pursuant to the automatic stay, 11 U.S.C. § 362, this case was stayed as to these two third-party defendants.

In light of the NCFE bankruptcy, the Bankruptcy Judge issued an order stating that she would "take no further action on the remanded matter unless and until the parties so request and file notice in this proceeding that the automatic stay in the NCFE bankruptcy case . . . has been lifted with respect to the matters at issue here . . . or that the stay has otherwise been terminated." Dec. 2, 2002 Procedural Order.

On the day that NCFE declared bankruptcy, the Hughes Defendants filed a motion requesting that this court lift its April 12, 2002 stay to permit the parties to proceed with expert discovery and to file motions for partial summary judgment and to permit the court to rule on various pending substantive motions.

After a hearing on February 4, 2003, the court issued an Order lifting the stay for

the limited purpose of briefing and deciding motions for judgment on the pleadings and summary judgment to be filed by the defendants ("the Motions"). The defendants were ordered to limit the scope of the Motions to "the following four issues: (a) whether the plaintiff has standing to pursue a private cause of action for breaches of fiduciary duty or if the Attorney General of Massachusetts is the only person who has standing to pursue the claims in this case; (b) whether any defendant who was an uncompensated board member of BRMC is entitled to immunity under M.G.L. ch. 231, § 85W; (c) whether any defendant who was a compensated board member or officer of BRMC is entitled to summary judgment because there is no genuine dispute of material fact as to whether he or she committed an intentional or grossly negligent violation of his or her fiduciary duties; and (d) whether Atlantic Adventist Healthcare Corporation ("AAHC") is entitled to judgment on the pleadings on its declaratory judgment counterclaim." Feb. 4, 2003 Order at 1–2.

AAHC renewed its motion for judgment on the pleadings as to Count IV and its declaratory judgment counterclaim. AAHC had originally filed this motion in May 2002. Ricks and Crunk each filed a motion for judgment on the pleadings on Counts I–III. The Case Defendants, Hughes Defendants and Hogan each filed a motion for summary judgment on Counts I–III. The Committee filed a consolidated opposition and the defendants filed reply briefs.

On April 23, 2003 the court held a hearing on the Motions. At the hearing, the court determined that additional briefing would be helpful on several issues. First, Crunk raised a question as to whether the court has subject matter jurisdiction over this case in her Reply filed on April 7, 2003. The Committee and other parties had not had an opportunity to address this issue. Second, the court had found some authority for the plaintiff's position that it has standing that the plaintiff did not cite in its submissions. The parties had not had an opportunity to address this authority. Finally, the court raised an issue regarding the propriety of the Committee, rather than the BRMC bankruptcy estate itself, bringing this case. Thus, the court ordered the parties to file supplemental briefs addressing these issues by May 7, 2003 and responses, if necessary, by May 12, 2003. The parties submitted supplemental briefs and responses and the Motions are now ripe for decision.

On March 24, 2004, the Committee notified the court that BRMC and NCFE had reached an agreement resolving all of their disputes, including the subject matter of the NCFE Action. The Committee further explained that the objections of the Trustee Defendants had been resolved, and filed a motion, to which no party objected, to dismiss NCFE and Poulson as third-party defendants in this case and approve the settlement of the NCFE Action. On March 29, 2004, the court allowed this motion.

## IV. ANALYSIS

### A. THIS COURT HAS SUBJECT MATTER JURISDICTION OVER THIS CASE

In her Reply submitted on April 7, 2003, Crunk suggested that this court lacks subject matter jurisdiction over this case. Generally, when a party raises a challenge to the court's subject matter jurisdiction, the court should address that challenge before turning to any other issues. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

Crunk argues that it is the sole prerogative of the Commonwealth, acting as *parens patriae*, to approve or disapprove of a

sale of substantially all of an acute care hospital's assets. In Crunk's April 7, 2003 Reply, she argued that in approving such a sale, the Supreme Judicial Court "exercise[s] the sovereign's power, under the doctrine of *cy pres,* to declare that the sale transaction is in the public interest." Crunk's Reply at 12. Since this is not a judicial function, but rather an exercise of the sovereign power to control charities that inheres in the Commonwealth, Crunk argues that this court lacks subject matter jurisdiction over the Committee's suit. *Id.* Crunk cites *Fontain v. Ravenel,* 58 U.S. 369, 17 How. 369, 15 L.Ed. 80 (1854) for the proposition that:

> The courts of the United States cannot exercise any equity powers, except those conferred by acts of congress, and those judicial powers which the high court of chancery in England, acting under its judicial capacity as a court of equity, possessed and exercised, at the time of the formation of the constitution of the United States. Powers not judicial, exercised by the chancellor merely as the representative of the sovereign, and by virtue of the king's prerogative as parens patriae, are not possessed by the circuit courts.

Chief Justice Roger Taney, concurring in the judgment in *Fontain,* but disagreeing with the majority's reasoning, explained that Article III confers only judicial power on the federal courts and "prerogative powers, which belong to the sovereign as *parens patriae,* remain with the States" and "state laws will not authorize the courts of the United States to exercise any power that is not in its nature judicial; nor can they confer on them the prerogative powers over minors, idiots, and lunatics, or charities, which the English chancellor possesses." *Id.* at 393 (Taney, C.J., concurring in the judgment). The First Circuit in *King v. Lean Asylum of the Massachusetts General Hospital,* 64 F. 331 (1st Cir.1894)

confirmed that circuit courts do not possess the powers of the chancellor as representative of the sovereign.

Thus, under old but still valid precedent, if the task that the Committee asks this court to undertake is not judicial in nature, this court lacks subject matter jurisdiction under Article III. However, as the Committee argues in its Supplemental Memorandum, the task at hand is judicial in nature. First, the issues before this court do not include the approval of a sale of a hospital's assets. Rather, the issues are whether, in pursuing that sale and taking other actions, BRMC's Trustees breached their fiduciary duties to the corporation. In many respects, this case is a traditional corporate mismanagement suit, although one with non-traditional parties. Second, the Supreme Judicial Court has held that when it exercises *cy pres* power, a court of chancery "regulates the disposition of [trust] property under its general jurisdiction on the subject of trusts, and not as administering a branch of the prerogative of the king as *parens patriae." Am. Academy of Arts & Sciences v. President, etc. of Harvard College,* 78 Mass. 582, 593 (1832). This exercise of judicial power to resolve disputes over the terms of a charitable trust or the propriety of a sale of trust assets is materially different than the "prerogative power of ordaining what the testator [of a charitable trust] has failed to express," a power that, as Crunk argues, cannot be exercised by the Massachusetts state courts under the separation of powers provided for by Massachusetts law. *See Jackson v. Phillips,* 96 Mass. 539, 576 (1867).

In her reply to the Committee's Supplemental Memorandum, Crunk acknowledged "that the Massachusetts Supreme Judicial Court performs a judicial function, rather than a prerogative function, in its exercise of *cy pres* according to well-estab-

lished trust law." Crunk's Reply to Comm.'s Supp. Mem. at 14. Despite this admission, Crunk still maintains that the exercise of jurisdiction by this court would amount to "an unconstitutional invasion of the separation of powers guaranteed to the defendants by Article 30 of the Massachusetts Declaration of Rights; and, it would, thereby contravene the Tenth Amendment to the U.S. Constitution." *Id.* at 16. Article 30 provides that "[i]n the government of this commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them: the executive shall never exercise the legislative and judicial powers, or either of them: the judicial shall never exercise the legislative and executive powers, or either of them: to the end it may be a government of laws and not of men." Crunk argues that since it is exclusively the province of the Attorney General "to determine whether the application of charitable funds and/or the sale of charitable assets is in the public interest, the federal court cannot usurp his function" without violating Article 30 and the Tenth Amendment. Crunk's Reply to Comm.'s Supp. Mem. at 15.

Even if the court were to assume that the Tenth Amendment makes the Massachusetts Declaration of Rights binding on this court—a proposition that Crunk does not fully explain—Crunk's argument is unpersuasive. To be sure, as explained in Part IV.B.1, *infra,* the Attorney General has a role in protecting the beneficiaries of charitable trusts. He can exercise this role in several ways, one of which is by bringing suits in the state and federal courts. When a state or federal court hears one of these cases, it is not exercising an executive or legislative function or acting as the representative of the sovereign and performing the present-day equivalent of setting forth the king's signature to exercise his prerogative powers. It is exercising the judicial function of resolving a controversy between parties when one party claims that the other has violated, is violating, or imminently will violate the laws governing nonprofit corporations and their trustees. That is exactly the sort of controversy presented by this case, although the party bringing the action is the Committee rather than the Attorney General.

Thus, the court finds that it is performing a judicial function and the requirements of Article III are satisfied. Since this proceeding relates to a bankruptcy case, this court has a statutory grant of subject matter jurisdiction under 28 U.S.C. § 1334(b). Accordingly, the court will not dismiss this case for want of subject matter jurisdiction.

## B. AAHC IS NOT ENTITLED TO JUDGMENT ON THE PLEADINGS AS TO COUNT IV

AAHC argues that it is entitled to judgment on the pleadings as to Count IV because: (1) as only the Attorney General may sue for breach of duty to a public charity, the Committee lacks standing to bring this case; (2) even if the Committee has standing to sue for breaches of duty in general, it may not sue for breaches of duty arising out of a transaction that must be approved by the Attorney General under M.G.L. ch. 180, § 8A(d); and (3) even if the Committee could bring this suit, the Attorney General is an indispensable party within the meaning of Federal Rule of Civil Procedure 19 and the case should be dismissed as he has not been joined. These arguments are also made by the other defendants in their motions for judgment on the pleadings and summary judgment. Accordingly, the court has considered the arguments made by all parties in deciding AAHC's Motion for Judgment on the Pleadings and will apply the conclusions that it draws with regard to this

motion when deciding the other five substantive motions currently pending.

"Under Rule 12(c), all material allegations in the complaint must be credited in the light most favorable to the plaintiff." *United States v. United States Currency, $81,000,* 189 F.3d 28, 33 (1st Cir.1999). Judgment on the pleadings should not be granted "unless it appears beyond doubt that [the Committee] can prove no set of facts in support of [its] claims which would entitle [it] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Even applying this rigorous standard, if any of the three arguments presented by AAHC were correct, the court would be compelled to enter judgment for the defendants on Counts I–IV or dismiss the case. However, the defendants' position is not persuasive.

Before reaching the merits of these three arguments, the court must briefly address two additional arguments that AAHC first presented in its supplemental memorandum submitted after the April 23, 2003 hearing. AAHC argues that claims for aiding and abetting breach of fiduciary duty inhere in a corporation's creditors rather than the corporation itself and that the Committee's claims are barred by the doctrine of *in pari delicto.* AAHC states that "[w]hile the Court did not expressly request briefing on these ... two issues, they arise now based on the Court's tentative conclusion that the Committee does not have standing to sue on behalf of BRMC's creditors, but perhaps standing to sue only on behalf of BRMC." AAHC's Supp. Mem. at 3 n. 2. The Committee filed a motion to strike these two arguments as "outside the scope of the Court's order to address certain issues." Comm.'s Mot. to Strike at 1. AAHC did not respond to the Committee's Motion to Strike.

For the following reasons, the court is allowing the Committee's Motion to Strike. The additional issues AAHC presented are outside the scope of the court's briefing orders. The court notes that the other defendants recognized that "the Court called for briefing only on certain discrete issues" and limited their submissions accordingly. Hughes Defs.' Supp. Mem. at 1; *accord* Case Defs.' Supp. Me. at 1 ("particular legal questions"); Crunk's Supp. Mem. at 9 ("specific questions"). Accordingly, AAHC's new arguments have been presented in an untimely manner.[2] In its April 23, 2003 Order, the court identified four specific issues on which the parties were to submit supplemental briefs by May 7, 2003. Any responses were to be filed by May 12, 2003. As the Committee correctly notes, "the time period pr[e]scribed by the Court for replies contemplates that no new issues would be presented at this stage." *Id.* at 3 n. 1. The court finds that although the importance of the issues raised by AAHC for the first time in its Supplemental Memorandum was certainly more clear after the April 23, 2003 hearing, there was no reason that AAHC could not have raised these issues in May 2002 when it filed its motion for judgment on the pleadings, in June 2002 when it filed its reply in support of that motion, in March 2003 when it had another opportunity to file a memorandum in support of that motion, in April 2003 when it filed a memorandum in response to the Committee's March 2003 filing or in April 2003 at the hearing. *See* Local Rule 7.1(b)(3) (requiring leave of court for filing additional papers in support of or in opposition to motions); *CMM*

---

**2.** Although the same might be said about Crunk's argument regarding subject matter jurisdiction, the suggestion that a federal district court lacks subject matter jurisdiction over a case is accorded special status and may be raised at any time. *See* Fed.R.Civ.P. 12(h)(3).

*Cable Rep., Inc. v. Ocean Coast Props., Inc.,* 97 F.3d 1504, 1526 (1st Cir.1996) ("[N]ot only can parties not claim error based on arguments which the district court never had a chance to timely consider, but courts are also entitled to expect represented parties to incorporate all relevant arguments in the papers that directly address a pending motion."); *McCoy v. MIT,* 950 F.2d 13, 23 (1st Cir.1991) ("[T]he plaintiff has an affirmative responsibility to put his best foot forward in an effort to present some legal theory that will support his claim."); *cf. Rivera–Muriente v. Agosto–Alicea,* 959 F.2d 349, 354 (1st Cir. 1992) ("It is well settled in this court, for good reason which need not be rehearsed here, that a legal argument made for the first time in an appellant's reply brief comes too late and need not be addressed.").

1. *Generally, the Bankruptcy Estate of a Massachusetts Non–Profit Corporation May Maintain an Action Against its Former Trustees for Breach of Fiduciary Duty*

■ In each of the first three counts of the complaint, the Committee alleges violations of the Trustees's fiduciary duty to BRMC *and* its creditors. To the extent that the Committee seeks to assert claims on behalf of individual creditors or the creditors as a class, it does not have standing. *See, e.g., In re Rare Coin Galleries of Am., Inc.,* 862 F.2d 896, 900 (1st Cir.1988) ("The [bankruptcy] trustee, however, has no power to assert any claim on behalf of the creditors when the cause of action belongs solely to them."); *Miller v. Harding,* 248 F.3d 1127, 2000 WL 1792990, at *2 (1st Cir. Dec.5, 2000) (unpublished) ("[A] bankruptcy trustee has ... no standing to represent the creditors and investors in their individual claims."); *cf. Fleming v. Bank of Boston Corp.,* 127 F.R.D. 30 (D.Mass.1989) (holding that receiver of investment company lacked standing to prosecute claims on behalf of investors), *aff'd sub nom., Fleming v. Lind–Waldock & Co.,* 922 F.2d 20, 24–25 (1st Cir.1990) (same). The Committee has not been assigned the individual claims of creditors against the defendants in this case.[3] The mere fact that it is the "creditors" committee does not confer standing. If the Trustee Defendants owed a duty to creditors, it owed that duty to the creditors as individuals and they would need to bring an action for breach of that duty as individuals or as a class. Although the Committee serves to represent the creditors in the context of the bankruptcy proceedings, any claims that the creditors have against the defendants are the property of the creditors individually and must be asserted by them rather than the Committee.

Some of the cases cited by the Committee refer to a bankruptcy trustee asserting "general" claims on behalf of a community of creditors. However, there is nothing to distinguish these "general" claims from the claims of the corporation. A "general" creditor's claim is a claim that all creditors have been disadvantaged because the corporation lost assets with which it could pay creditors. *See, e.g., Koch Refining v. Farmers Union Central Exchange, Inc.,* 831 F.2d 1339, 1348 (7th Cir.1987) ("If the liability is to all creditors of the corporation without regard to the personal dealings between such officers and such creditors, it is a general claim."). The distinction is similar to that between shareholder class actions seeking to vindicate shareholders' rights and shareholder derivative suits seeking to as-

---

**3.** Such an assignment might not be valid. *See Williams v. California 1st Bank,* 859 F.2d 664, 666–67 (9th Cir.1988).

sert the corporation's rights, ultimately benefitting the shareholders. It is questionable whether this court would have federal question jurisdiction over an action brought by creditors because it would no longer be brought on behalf of the bankruptcy estate, but would rather be brought by BRMC's creditors against BRMC's former officers and directors without any involvement of the debtor itself.

Thus, insofar as the Committee seeks to vindicate the rights of the creditors, it lacks standing.[4] However, to the extent that it seeks to benefit the creditors by vindicating the rights of the bankruptcy estate and thereby obtaining assets with which the estate can pay creditors, both the Committee and the estate itself have standing to sue.

The defendants argue that the Attorney General has the exclusive authority to enforce charitable trusts and sue for breaches of fiduciary duty or mismanagement of trust assets. Consequently, they contend that the Committee "does not have standing, under Massachusetts law, to pursue these claims on behalf of itself, Reorganized BRMC, or the creditors of BRMC." AAHC's 2002 Mem. at 13; *accord* AAHC's 2002 Reply at 1–3; AAHC's 2003 Reply at 7–9; Case Defs.' Mem. at 3–6; Case Defs.' 2003 Reply at 1–3; Hughes Defs.' Mem. at 11–13; *see also* M.G.L. ch. 12, § 8. The defendants cite several cases in support of their argument. Typical of these cases is the Supreme Judicial Court's decision in *Weaver v. Wood,* 425 Mass. 270, 275–76, 680 N.E.2d 918 (1997):

> We consistently have held that only the Attorney General can bring an ac-

tion alleging the misuse of charitable assets. A century ago we noted: "The law has provided a suitable officer to represent those entitled to the beneficial interests in a public charity. It has not left it to individuals to assume this duty, or even to the court to select a person for its performance. Nor can it be doubted that such a duty can be more satisfactorily performed by one acting under official responsibility than by individuals, however honorable their character and motives may be." *Burbank v. Burbank,* 152 Mass. 254, 256, 25 N.E. 427 (1890).

In *Dillaway v. Burton,* 256 Mass. 568, 573, 153 N.E. 13 (1926), we held that it is "the exclusive function of the Attorney General to correct abuses in the administration of a public charity by the institution of proper proceedings. It is his duty to see that the public interests are protected and to proceed in the prosecution or to decline so to proceed as those interests may require."

The caselaw is replete with similar pronouncements. *See, e.g., Ames v. Atty. Gen.,* 332 Mass. 246, 250, 124 N.E.2d 511 (1955) ("It is well settled that it is the exclusive function of the Attorney General to correct abuses in the administration of a public charity by the institution of proper proceedings."); *Lopez v. Medford Community Ctr., Inc.,* 384 Mass. 163, 167, 424 N.E.2d 229 (1981) (same); *Garland v. Beverly Hosp. Corp.,* 48 Mass.App.Ct. 913, 914, 720 N.E.2d 838 (1999) ("The Legislature has determined that only the Attorney General, on behalf of the general public, has the requisite standing to bring an

---

4. This conclusion means that the court need not address the extensive and interesting arguments on the question of whether a director's fiduciary duties "flip" from shareholders to creditors when a corporation enters the zone of insolvency and whether this rule should apply in the context of charitable corporations. It is undisputed that directors owe a fiduciary duty to the corporation regardless of the corporation's financial condition.

action alleging the misuse of charitable assets.").

However, in his well-known and often cited treatise on trust law, Professor Scott explains:

It is frequently said in the cases that the Attorney General alone has power to maintain suits for the enforcement of charitable trusts. This, however, is not strictly true. It is clear, for example, that where there are several trustees, one of them may maintain an action against the others to enforce the trust or to compel the redress of a breach of trust.

IVA William Franklin Fratcher, *Scott on Trusts* § 391 at 364–65 (4th ed.1989). The defendants have attempted to distinguish the four Massachusetts cases that Professor Scott cites as support for this proposition: *Morville v. Fowle,* 144 Mass. 109, 10 N.E. 766 (1887); *Eastman v. Allard,* 149 Mass. 154, 21 N.E. 235 (1889); *Crawford v. Nies,* 220 Mass. 61, 107 N.E. 382 (1914); *Crawford v. Nies,* 224 Mass. 474, 113 N.E. 408 (1916). Given the fact that these four cases were decided before significant changes to the statutes governing charitable corporations and that they deal with one trustee suing another rather than a nonprofit corporation suing one of its former trustees, the court finds the defendants' arguments persuasive and agrees that these cases are not controlling. However, for the reasons described below, Professor Scott's observation that the Attorney General's "exclusive" standing to sue is not truly exclusive is still accurate.

■ The Committee's position that a charitable trust may sue its former officers and directors for breach of fiduciary duty is bolstered by *Boston Children's Heart Foundation v. Nadal–Ginard,* 73 F.3d 429 (1st Cir.1996) [hereinafter *"BCHF "*]. In 1995, Boston Children's Heart Foundation, a Massachusetts nonprofit corporation, sued Nadal–Ginard, its former president and member of its board of directors, for breach of fiduciary duty. The Attorney General was not a party. Following an eighteen-day bench trial, Judge Robert Keeton found that Nadal–Ginard violated his fiduciary duties to the plaintiff and entered judgment in the amount of $6,562,283.02. *Id.* at 432. The First Circuit affirmed. *Id.*

Some of the defendants attempt to distinguish *BCHF.* The Case Defendants suggest that *BCHF* is distinguishable because Nadal–Ginard was compensated, was an employee as well as a director, engaged in self-dealing and committed acts "so egregious that criminal charges were also brought." Case Defs.' Supp. Mem. at 4. Crunk argues that *BCHF* is a case dealing with misappropriation of charitable assets rather than misapplication of charitable assets. Crunk's Supp. Mem. at 12–14. However, none of these distinctions make any difference. If the defendants are correct that only the Attorney General may bring an action for misapplication of charitable assets and that a charitable corporation lacks standing to do so, then *BCHF* was wrongly decided.

■ Standing is a threshold question of who has the authority to represent the interests of a charity and, therefore, the public interests which the charity is bound to serve. If the charity itself lacks standing, it does not matter if the defendant is an uncompensated trustee or a compensated employee. The seriousness of the allegations is also not material. The distinction between misappropriation of charitable assets through self-dealing and misapplication of charitable assets through mismanagement is also not decisive. In cases of both misappropriation and misapplication of funds, the injury to the charity is the same. It is unable to use the funds for their intended purpose.

In *BCHF,* Nadal–Ginard was found liable for breaches of fiduciary duty that

related to his failure to comply with his duties of loyalty, good faith and candor. The plaintiffs allege violations of the same three duties in this case, as well as the duty of care. The defendants present no good reason why a charity should have standing to pursue claims for breaches of the duties of loyalty, good faith and candor but not for breaches of the duty of care.

■ However, as the defendants point out, neither the district court nor the First Circuit in *BCHF* directly addressed the question of the plaintiff's standing or, for that matter, the court's subject matter jurisdiction. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511, 45 S.Ct. 148, 69 L.Ed. 411 (1925).

Thus, the court finds, as some of the parties have come to accept, that the standing of a charity or that charity's bankruptcy estate to sue its former directors remains an open question under Massachusetts law. *See* Apr. 23, 2003 Tr. at 20–21 (AAHC); Comm.'s Reply to Defs.' Supp. Mems. at 3 (the Committee); Crunk's Reply to Comm's Supp. Mem. at 3–4 (Crunk). None of the cases cited by the parties directly holds that the Attorney General, rather than a charitable trust, its trustees, or its bankruptcy estate must file any suit on behalf of the trust that seeks damages for breaches of fiduciary duty by former officers or trustees. Instead, each case involves a potential beneficiary of the charity, such as a member of a church, or some other non-trustee, such as a donor, seeking to enforce the trust's charitable purposes or bylaws.[5]

---

5. *See Ames v. Atty. Gen.*, 332 Mass. 246, 124 N.E.2d 511 (1955) (petitioners who, for many years, were interested in and contributed to the Arnold Arboretum, but did not purport to bring suit on behalf of a visiting committee or other official body charged with overseeing the Arboretum, lacked standing to sue Harvard College and decision of Attorney General not to sue Harvard was within his discretion); *Bello v. S. Shore Hosp.*, 384 Mass. 770, 779, 429 N.E.2d 1011 (1981) (holding that physicians could not sue hospital for violating by-laws in refusing to grant staff privileges; "[T]he proper party to enforce the by-laws, aside from a member of the corporation, is the Attorney General in the exercise of his supervisory power over public charities."); *Boy Scouts of Am. v. Monadnock Trust, Inc.*, No. 93–2780, 1998 WL 1181763 (Mass.Super.Aug.13, 1998) (holding that Boy Scouts of America had standing to sue successor to local council that failed to obtain renewal of charter in order to seek transfer of two funds held by the successor); *Dillaway v. Burton*, 256 Mass. 568, 572–73, 153 N.E. 13 (1926) (holding that plaintiff lacked standing because as a member of the corporate defendant he was "without any visitorial powers as trustee" and his interests were represented by the trustees of the corporate defendant or, in the alternative, the Attorney General); *Elias v. Steffo*, 310 Mass. 280, 37 N.E.2d 991 (1941) (holding that plaintiffs, who were an Albanian town and several individuals who were members of a fundraising committee, lacked standing to sue defendants including officers and former officers of charity founded to benefit town); *Garland v. Beverly Hosp. Corp.*, 48 Mass.App.Ct. 913, 720 N.E.2d 838 (1999) (holding that neither status as resident of community where hospital was located nor status as donor conferred standing to sue hospital for improperly diverting charitable assets); *Lopez v. Medford Community Ctr., Inc.*, 384 Mass. 163, 424 N.E.2d 229 (1981) (holding that plaintiffs who alleged that they were members of a charitable organization lacked standing to sue officers for corporate mismanagement); *Loring v. Marshall*, 396 Mass. 166, 484 N.E.2d 1315 (1985) (discussing earlier case brought by charities in which the Attorney General was not a party); *Mahoney v. Atty. Gen.*, 346 Mass. 709, 715, 195 N.E.2d 540 (1964) (declining to declare power of trustees to convey land in part because Attorney General rather than town and its committee had sole standing to challenge trustees' alleged breach of trust); *Weaver v. Wood*, 425 Mass. 270, 680 N.E.2d 918 (1997) (holding that members of church did not have

The court finds that in this case the bankruptcy estate has standing to assert the claims presented, unless they have been assigned to the Committee. The Attorney General is the representative of the charity's beneficiaries rather than its trustees. This is clear from the common law principles on which the legislature based M.G.L. ch. 12, § 8. *See generally Ames v. Atty. Gen.*, 332 Mass. 246, 250, 124 N.E.2d 511 (1955) (noting identity of common law rule and rule codified at M.G.L. ch. 12, § 8). In the very excerpt from *Burbank* quoted in *Weaver, supra,* to which defendant AAHC draws the court's attention, the Supreme Judicial Court stated that "the law has provided a suitable officer to represent those entitled to the *beneficial interests* in a public charity." *Burbank v. Burbank*, 152 Mass. 254, 256, 25 N.E. 427 (1890) (emphasis added).[6] Thus, as with a private trust in which the beneficiaries may sue to enforce the trust, the beneficiaries of a public charitable trust, represented by the Attorney General, have a similar cause of action. The beneficiary's cause of action does not in any way conflict with or abrogate the right of the trustees of either a private or public trust to cause the trust to sue third parties, including former trustees, who have committed torts against the trust, including the tort of breach of fiduciary duty.

■ The Attorney General's standing to enforce the rights of the beneficiaries of charitable trusts is, as the Supreme Judicial Court has often said, exclusive. However, it is exclusive only of other individuals who claim to represent the trust's beneficiaries. It is not exclusive of the standing of the trust itself to seek redress for injuries to the trust. By preventing members of the public who may benefit from a charity from suing based on their asserted beneficial interest in the charitable trust, recognizing the Attorney General as the sole representative of the beneficiaries of a charity shields charities and their directors from multifarious litigation. Preventing the charitable trust itself from suing those who have harmed it serves no similar purpose.

Thus, the Attorney General serves as a potential surrogate who is able to represent the public interest when the trustees fail to do so. This special status as the representative of the public constitutes a supplement to, rather than a replacement for, the trustees acting in the name of a nonprofit corporation to vindicate its rights. A contrary rule would strain the resources of the Attorney General by requiring his participation in all litigation involving the alleged misapplication or misappropriation of charitable assets, even in cases where a charity is fully capable of protecting itself. It would also leave charities without a legal remedy when, for whatever reason, the Attorney General chooses not to use his limited resources to pursue directors or trustees who have harmed a charitable corporation.

■ Thus, this court holds that a Massachusetts nonprofit corporation has standing to sue any individual, including a trustee or former trustee, who has allegedly committed a tort against the corporation, including the tort of breach of fiduciary duty.

In this case, it is not the charitable corporation itself, BRMC, that is the plaintiff. Rather, it is the Committee, which claims to be acting on behalf of the bankruptcy estate. The bankruptcy estate

standing to sue church's directors for breach of fiduciary duty by investing in television venture in violation of church's governing documents).

**6.** The Hughes Defendants also identify *Burbank* as "the leading Massachusetts case concerning the Attorney General's exclusive standing." Hughes Defs.' Supp. Mem. at 3.

stands in the shoes of BRMC and can pursue any cause of action that was the property of BRMC at the time it filed its bankruptcy petition. As the Supreme Court wrote in *Pepper v. Litton*, 308 U.S. 295, 306–07, 60 S.Ct. 238, 84 L.Ed. 281 (1939) (footnotes omitted) "[w]hile normally [a director's] fiduciary obligation is enforceable directly by the corporation, or through a stockholder's derivative action, it is, in the event of bankruptcy of the corporation, enforceable by the [bankruptcy] trustee. For that standard of fiduciary obligation is designed for the protection of the entire community of interests in the corporation—creditors as well as stockholders." *See also Louisiana World Exposition v. Federal Insurance Co.*, 858 F.2d 233, 246 (5th Cir.1988).

AAHC argues in footnote 47 of its Memorandum that "[r]egardless of whether the Committee has commenced this action in its own name, the name of Reorganized BRMC, or in the name of the creditors of BRMC, it would be acting on behalf of an entity different from the debtor, BRMC .... [t]hus, this is not an action commenced by a charity against its own Directors and Officers." Although it is true that Reorganized BRMC and the Committee are not the same entities as the debtor, BRMC, this makes no difference for purposes of deciding the standing question. All of BRMC's assets, including any causes of action against the defendants in this case, became part of the bankruptcy estate. *See* 11 U.S.C. § 541(a)(1);[7] Plan § 5.1. Therefore, if BRMC could have sued the defendants in this case before it declared bankruptcy, the estate can sue the defendants after BRMC entered bankruptcy.

However, the estate is not the plaintiff in this case. The Committee is the plaintiff. This presents questions which cannot be properly resolved on the present record.

2. *The Committee Shall Present Additional Evidence to the Court Supporting Its Authority to Bring This Case or Move to Amend the Complaint So That An Appropriate Plaintiff Is Named*

Under the Plan confirmed in BRMC's bankruptcy, any causes of action belonging to BRMC vested in Reorganized BRMC. At the April 23, 2003 Hearing, the court raised the following question:

THE COURT: ... Is there something that makes the Official Committee a proper entity to sue if Reorganized BRMC is the proper entity to sue? I can ask the plaintiffs that.

MR. BENNETT [counsel for the Committee]: Your Honor, the Committee is ultimately bringing this cause of action to recover on behalf of the estate and to have those proceeds available for distribution to the estate. So it is act[ing] on behalf of the estate of BRMC.

THE COURT: Who authorized— what authorizes you to do that?

MR. BENNETT: Your Honor, the plan authorized the liquidation of the assets. The liquidating supervisor was in place at the time of the lawsuit, and the Committee—decision was made to have the Committee bring the lawsuit. This is not something that's in the papers.....

---

**7.** AAHC's suggestion that the Committee is arguing that federal law preempts the provisions of state law that vest the exclusive right to sue in the Attorney General is misplaced. AAHC's 2002 Mem. at 17–19. The corporation could have sued under state law. Federal law serves the limited purpose of transferring the corporation's claim to the bankruptcy estate. *See Louisiana World Exposition, supra.*

THE COURT: But are there documents that show that essentially whatever Reorganized BRMC would be authorized to do, the Official Committee is authorized to do?

MR. BENNETT: I believe there's a sufficient trail to establish that the Committee was authorized to take the actions that it took, and there w[ere] reasons for it, yes.

\*　\*　\*　\*　\*　\*

MR. BEAN [counsel for AAHC]: .... I would suggest that what's happening here is—in some way, there's a misnomer by having the Committee as the plaintiff. Frankly, I think ... the liquidating agent should be the plaintiff.

THE COURT: In fact, if that's where this comes out, that could be taken care of with an amendment.

MR. BEAN: I'm not worried about that. You're right.

Apr. 23, 2003 Tr. at 10–12.

The court ordered the parties to address this issue in their supplemental briefs. The Case Defendants stated that if BRMC could maintain a suit against the defendants so could the Committee. Case Defs.' Supp. Mem. at 6. Contrary to its statement at the hearing, AAHC stated that "only the 'Liquidating Agent' has standing to pursue causes of action" and "[b]ecause the time for amending the Complaint lapsed more than two years ago, the Committee should not be permitted to amend its complaint and the case should be dismissed." AAHC's Supp. Mem. at 2 n. 1. Crunk states that she "does not ... concede the Committee's authority to act on behalf of BRMC for purposes of instituting the claims set forth in Counts I, II and III of the Complaint," but is not pressing the issue as part of her motion for judgment on the pleadings. Crunk's Reply to Comm.'s Supp. Mem. at 6. The Hughes Defendants state that "[i]n light of the Court's indication at the hearing that it might be disposed to grant an amendment to the pleadings to substitute the Liquidating Agent as plaintiff, the Defendants do not press this point." Hughes Defs.' Supp. Mem. at 4. Thus, this issue remains disputed by the parties and of concern to the court.

The Hughes Defendants also present a plausible explanation of why the Committee might have brought this suit in its own name rather than rely upon Reorganized BRMC to sue on its own behalf and in its own name.[8] The directors and officers insurance policy (the "Policy") covering the actions of Ricks, Crunk and the Trustee Defendants has a so-called "insured versus insured" exclusion. This clause purports to exclude from coverage any suits between parties covered by the Policy. BRMC is also insured under the Policy. The insurer has raised this clause as a reason to deny coverage and has filed an action seeking a declaratory judgment that it may properly deny coverage. That case is currently pending in the Bankruptcy Court, as this court denied the insurer's motion to withdraw the reference to the District Court without prejudice. The Hughes Defendants suggest that:

> Because both BRMC and its officers and directors were insureds under the policy, neither BRMC nor its Liquidating Agent could be named as plaintiffs without risking coverage. Thus, it appears that the Creditors' Committee made the strategic decision to bring the case in its own name, and knowingly allowed the deadline imposed by the Bankruptcy Court for amendments to the pleadings

---

8. The court notes that in the adversary proceeding against NCFE, BRMC sued in its own name.

to pass without adding either BRMC or its liquidating agent as a party plaintiff, choosing to maintain in its own name a complaint that straddles the line between the rights of BRMC and the rights of BRMC's creditors.

Hughes Defs.' Supp. Mem. at 7. If the insurer successfully denies coverage, the amount of money available for the Committee or the Estate to collect is likely to be significantly reduced.

In response to the court's April 24, 2003 Order the Committee directed the court to the First Amended Disclosure Statement as support for its authority to bring this case. *See* Comm.'s Supp. Mem. at 8–9. The Disclosure Statement provides, in pertinent part, that "[i]t is the Committee's intention to further investigate and pursue" causes of action against BRMC's officers and directors for breach of fiduciary duty. *Id.* The Committee also points to the provisions of the Plan that provide for the continued existence of the Committee and its oversight over the liquidation of assets. *Id.* Finally, the Committee states that if the court determines that it is not a proper plaintiff, it "is prepared to submit an amended complaint naming the Liquidating Agent as the Plaintiff." *Id.* at 10.

The court is not persuaded that the Plan provision and Disclosure Statement identified by the Committee overcome the clear language of the Plan vesting all assets, including causes of action, in Reorganized BRMC and empowering Reorganized BRMC to pursue those causes of action. *See* Plan §§ 5.1, 13.2. Accordingly, the court is ordering the Committee to either submit documents or affidavits establishing that it has been assigned BRMC's causes of action against the defendants in this case or file a motion to substitute the appropriate plaintiff. The court will not now attempt to predict how such a substitution might impact the insurer's declaratory judgment action. However, as this issue and the successful outcome of the Trustee Defendants' motions for summary judgment bear on the dispute over the insurance policy, the court is ordering that a copy of this Memorandum and Order be sent to counsel for the insurer.

For now, the court assumes, without deciding, that either the Committee has been assigned the authority to sue the defendants that Reorganized BRMC was given or that a substitution of parties would cure any defect.

3. *The General Rule Applies in this Case Even Though Some of the Plaintiff's Allegations Relate to a Transaction Subject to the Requirements of M.G.L. ch. 180, § 8A(d)*

■ The defendants argue that even if the court determines that, generally, a charitable corporation as well as the Attorney General may sue its former directors for breach of fiduciary duty, it should not permit such suits when the transaction at issue must be reviewed by the Attorney General under M.G.L. ch. 180, § 8A(d). The defendants do not appear to contend that such a transaction is unreviewable by a court. Rather, they argue that the degree of oversight that the Attorney General has over all aspects of such a transaction makes him the only proper plaintiff to challenge the defendants' activities related to the transaction.

This argument is unpersuasive for three reasons. First, even if the defendants were correct, the allegations in this case go beyond the approval of the DCHC transaction and include allegations of more general mismanagement of BRMC. Consequently, even if the Committee lacked standing to assert a breach of fiduciary duty relating to the DCHC transaction, it would still have standing to assert its other claims of corporate misconduct. Second, the fact that the Attorney General has approved a

transaction does not strip a charity of standing. The fact that the Attorney General assented to a transaction does not mean that he has given his stamp of approval to the manner in which the transaction is executed after his approval. Both the nature of the DCHC transaction and the conduct of the Trustee Defendants while the transaction was closing are at issue in this case. Third, in this case the Attorney General ultimately neither approved nor rejected the DCHC transaction as the proposal was terminated before the Attorney General's investigation was completed. Thus, contrary to the defendants' contentions, the Committee is not asking this court to "second-guess" the Attorney General's conclusions regarding the transaction and the outcome of this case will not create a conflict between this court and the Attorney General.

The court is not suggesting that the Attorney General's views regarding a transaction he has completely investigated under M.G.L. ch. 231, § 8A(d) are irrelevant. They may provide meaningful evidence that the trustees of a charity were not negligent in approving a particular transaction. It might be difficult to prove that trustees acted unreasonably if the Attorney General approved of their actions after a fully informed and thorough investigation. In some cases, the Attorney General's approval might provide the basis for a meritorious motion for summary judgment in favor of defendant directors. This, however, is not one of those cases.

4. *The Attorney General Is Neither a Necessary Nor Indispensable Party*

The defendants also argue that the court should dismiss this case under Federal Rule of Civil Procedure 19 because the plaintiff has failed to join an indispensable party, the Attorney General. Although AAHC has conceded that if the Committee has standing that the Attorney General is not a necessary or indispensable party, *see*

Apr. 23, 2003 Tr. at 13, it is unclear if the other defendants make this concession.

■■■ As a threshold matter, federal law governs this question notwithstanding the Massachusetts statute which provides that "[t]he attorney general shall be made a party to all judicial proceedings in which he may be interested in the performance of his duties [overseeing charities]." M.G.L. ch 12, § 8G. If a Federal Rule of Civil Procedure governs a question, the court must apply it unless the rule violates the Rules Enabling Act or the Constitution. *See Hanna v. Plumer*, 380 U.S. 460, 471, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965) (stating general rule); *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 125 n. 22, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968) (stating that Rule 19 governs joinder even in diversity cases). Rule 19 provides, in pertinent part:

(a) A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.....

(b) If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent

person being thus regarded as indispensable.....

Professors Wright, Miller and Kane describe the process for deciding a party-joinder question:

The structure of Rule 19 reflects the analytical sequence that a court should follow in deciding a party-joinder question. Once an issue of compulsory joinder is raised, the court initially must determine whether the absent person's interest in the litigation is sufficient to satisfy one or more of the tests set out in the first sentence of Rule 19(a)..... When joinder of someone described in Rule 19(a) is not feasible, the court must examine the four considerations described in Rule 19(b) to determine whether the action may go forward in the nonparty's absence or must be dismissed, "the absent person being thus regarded as indispensable." By proceeding in this orderly fashion the court will be able to avoid grappling with the difficult question of indispensability whenever it initially decides that the absentee's interest is not sufficient to warrant compelling joinder.

7 Charles Alan Wright et al., *Federal Practice and Procedure* § 1604, at 39–40; *accord Temple v. Synthes Corp.*, 498 U.S. 5, 8, 111 S.Ct. 315, 112 L.Ed.2d 263 (1990) ("Here, no inquiry under Rule 19(b) is necessary, because the threshold requirements of Rule 19(a) have not been satisfied.").

■■ In their filings, the defendants improperly conflate "necessary" parties with "indispensable" parties. In order to obtain a dismissal, the defendants must demonstrate not only that the Attorney General is a necessary party under Rule 19(a) but also that he is indispensable within the meaning of Rule 19(b). *See, e.g.*, Crunk's Mem. at 9 (arguing that a Rule 19 dismissal "should be granted where the moving party is able to satisfy the requirements of Rule 19(a)").

The Committee argues that since this is not the type of action that must be brought by the Attorney General, he need not be joined as a party either. It is true that this is not the typical proceeding against a group of trustees of a charitable organization. Typically, the trustees are still in office and if the Attorney General did not sue them, there would be none with standing who could sue. In this case there is a group, the Committee, that seems to be highly motivated to enforce BRMC's rights against its former trustees because, ultimately, the creditors will be entitled to the proceeds. However, at least in theory, the Attorney General still has some interest in ensuring that the interests of the beneficiaries are served by this case. Arguably, the Committee, being a committee of creditors, is not likely to strive to ensure that there is money left in the bankruptcy estate for BRMC's "equity holders"—the intended beneficiaries of the charitable trust.

The practical implications of the BRMC bankruptcy appear to be such, however, that even if the Committee is very successful in pursuing BRMC's claims, the unsecured creditors will still not be paid in full.[9] Thus, in the end, it is likely that

9. According to the Murphy Affidavit, Exhibit 1 to the Bennett Affidavit, as of March 19, 2003, the BRMC estate owed just over $35,000,000 on undisputed, liquidated unsecured claims and an additional $12,000,000 on disputed, unliquidated unsecured claims. The estate also has other smaller debts. The estate's cash reserves total $7,300,000. The settlement of the NCFE Action has closed this gap somewhat. However, the estate's debts still greatly exceed its assets. In order for there to be residual assets for the beneficiaries of the charitable trust after the creditors are paid in full, the estate would need to recover well over $20,000,000. The court is not persuaded that even if the plaintiff prevails, it will be able to obtain a judgment for this much money and collect on it.

there will be nothing left for the beneficiaries of BRMC for the Attorney General to protect. This would not be an unusual situation in the bankruptcy context. *See Louisiana World Exposition*, 858 F.2d at 250–51 (citing *CFTC v. Weintraub*, 471 U.S. 343, 345, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985)).

It is undisputed that the Attorney General knows about this case. He could have intervened, but chose not to. There are several possible reasons for this decision. Perhaps the Attorney General has concluded that the Committee's claims are without merit. Perhaps he has determined that even if the Committee is successful, there will be no assets left for him to protect. Perhaps he is satisfied with the Plan's provision that any remaining assets will be transferred to the Southern New England Conference of Seventh Day Adventists. Perhaps he has decided that his limited resources are better spent overseeing charities that are still operating rather than attempting to resurrect one that is in the process of winding up. The Attorney General's motives for not intervening are a matter of speculation. Based on such speculation, the defendants ask this court to second-guess the Attorney General's decision not to intervene and to force him to become a party to this action, or, in the alternative, determine that he cannot be joined and dismiss the case because he is indispensable.

A Rule 19 analysis reveals that the Attorney General is not a necessary party, so the court need not reach the question of whether he is indispensable. The Attorney General does not fall into either category of necessary parties described in Rule 19(a). The defendants argue that without the Attorney General, complete relief cannot be granted. AAHC's Mem. at 11; AAHC's 2002 Reply at 5; Case Defs.' Mem. at 6–7; Crunk's Mem. at 9–10. This argument relies on the premise that the Attorney General is the only party who can assert claims for breach of fiduciary duty to a charitable trust. Since this premise is incorrect, the argument is without merit.

The defendants do not contend that they meet the second criterion dealing with impairment of the Attorney General's interest or the possibility of multiple or otherwise inconsistent obligations. Indeed, it is difficult to identify how the defendants are harmed or even placed at risk as a result of the Attorney General's absence from this case. Given the fact that any recovery from the Trustee Defendants or their insurance carrier must be distributed through the bankruptcy estate in accordance with the Plan and that any recovery would likely go entirely to BRMC's creditors, it appears that the Attorney General has no practical interest in this litigation.

As the Attorney General is not a necessary party, he cannot be an indispensable party, and the defendants are not entitled to the dismissal of this case under Rule 19.

### C. AAHC IS ENTITLED TO JUDGMENT ON THE PLEADINGS ON ITS DECLARATORY JUDGMENT COUNTERCLAIM

The Committee alleges in Count IV of its complaint that AAHC aided and abetted the BRMC Trustees' breach of fiduciary duty. AAHC filed a counterclaim seeking a declaratory judgment that any liability it has on count IV is limited to $20,000 exclusive of interest and costs under M.G.L. ch. 231, § 85K. The Committee argues that AAHC is not entitled to the liability cap of § 85K because its actions were primarily commercial in character. This claim is not persuasive. Therefore, the court finds that AAHC is entitled to the protection of § 85K.

M.G.L. ch. 231, § 85K provides, in pertinent part, that:

[I]f [a] tort was committed in the course of any activity carried on to accomplish directly the charitable purposes of such [charitable] corporation, trust, or association, liability in any such cause of action shall not exceed the sum of twenty thousand dollars exclusive of interest and costs. Notwithstanding any other provision of this section, the liability of charitable corporations ... shall not be subject to the limitations set forth in this section if the tort was committed in the course of activities primarily commercial in character even though carried on to obtain revenue to be used for charitable purposes.

The Supreme Judicial Court recently reviewed the test for determining whether a charity is entitled to the liability cap of § 85K. In *Conners v. Northeast Hospital Corp.*, 439 Mass. 469, 477–80, 789 N.E.2d 129 (2003), the court held that the inquiry into whether an activity is primarily commercial in nature cannot be separated from the inquiry into whether that activity accomplishes directly the goals of the charity. The court explained:

> To determine whether the statutory limitation on liability applies in a given case, Conners elevates the "primarily commercial" analysis of § 85K's second sentence to a separate test, independent of the "accomplished directly" analysis set forth in the first sentence. The two considerations denoted in the statute are not independent. Having determined, correctly, that the hospital's activity challenged by Conners "accomplished directly" the charitable purposes of Northeast, it was not necessary for the judge to consider whether those activities were "primarily commercial in character."

*Id.* at 478, 789 N.E.2d 129.

"The specific purpose of [AAHC] is to accomplish the goals and objectives of the Church in providing the optimum level of health and medical care to the general public." AAHC's Appx. at 87. Thus, if the activities of AAHC that form the basis of the Committee's Complaint directly accomplish the Church's goal of providing the optimum level of health and medical care to the general public, AAHC is entitled to the liability cap of § 85K.

AAHC argues persuasively that:

> The sale of BRMC to an entity such as DCHC that would permit BRMC to maintain its church affiliation, is not "entirely disconnected" from AAHC's purpose even if DCHC is a for-profit corporation. To the contrary, it is at the epicenter of this purpose according to the Committee's complaint. Similarly, BRMC's "fund balances transfers" to BRMA were made, according to the Committee, "to preserve AAHC's interest in BRMA and to avoid AAHC's funding of BRMA's continuing losses." Complaint, ¶ 42. Preservation of BRMA, a not-for-profit corporation which, according to the Committee, owned and managed various medical practices associated with BRMC, was thus *connected with* AAHC's mission of "providing the optimum level of health and medical care to the general public."

AAHC's 2002 Reply at 7 (emphasis in original).

The Committee responds that "[t]he devastating effects of the former officers and directors' conduct [leading] to BRMC's bankruptcy filing can hardly be in furtherance of the promotion of 'the wholeness of man physically, mentally, and spiritually.'" Comm.'s 2002 Opp. at 21 (quoting Church goals). The Committee also argues that it would be "patently absurd and unreasonable" to allow a charity to commit any intentional tort, short of committing a crime, and capping the charity's liability at $20,000. However, the Committee does not directly address AAHC's argument that whenever it was interacting

with BRMC and its directors, it was acting to directly accomplish its charitable purpose.

The charitable immunity cap may arguably be a poor policy when viewed solely in the context of a particular case. The Committee alleges that AAHC and the Church essentially operated a loose affiliation of corporations and placed the future of one at great and unreasonable risk in order to protect and benefit the others. Arguably, such conduct, if proven, should be fully remediable in judicial proceedings. However, the Legislature has in § 85K weighed the competing considerations and chosen to limit strictly the remedy for any such misconduct. That is a judgment concerning policy properly made by elected and democratically accountable officials which the courts must respect and enforce.

## D. THE UNCOMPENSATED TRUSTEE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT

All of the defendants in this case other than Ricks, Crunk and AAHC served as uncompensated trustees of BRMC. They have moved for summary judgment arguing, among other things, that they are entitled to immunity under M.G.L. ch. 231, § 85W. The statute provides that:

> [N]o person who serves without compensation . . . as a[ ] . . . trustee of any nonprofit charitable organization . . . shall be liable for any civil damages as a result of any acts or omissions relating solely to the performance of his duties as a[ ] . . . trustee; provided, however, that the immunity conferred by this section shall not apply to any acts or omissions intentionally designed to harm or to any grossly negligent acts or omissions which result in harm to the person.
>
> Nothing in this section shall be construed as affecting or modifying the liability of any person subject to this section for acts or omissions which are committed in the course of activities primarily commercial in nature even though carried on to obtain revenue to be used for charitable purposes, nor for any cause of action arising out of such person's operation of an automobile.

As explained earlier, the court has subject matter jurisdiction and the Committee has standing to sue. Therefore, the claim of immunity is the sole remaining reason that these defendants might be entitled to summary judgment.

The court's discretion to grant summary judgment is governed by Federal Rule of Civil Procedure 56. Rule 56 provides, in pertinent part, that the court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In making this assessment, "the court must look at the record in the light most favorable to the party opposing the motion and must indulge all inferences favorable to that party." *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 928 (1st Cir.1983); *Attallah v. United States*, 955 F.2d 776, 779 (1st Cir.1992); *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990).

In determining the merits of a motion for summary judgment, the court is compelled to undertake two inquiries: (1) whether the factual disputes are genuine, and (2) whether any fact genuinely in dispute is material. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law properly

preclude the entry of summary judgment." *Id.* To determine if the dispute about a material fact is "genuine," the court must decide whether "the evidence is such that a reasonable [factfinder] could return a verdict for the non-moving party." *Id.; see also Medina–Munoz,* 896 F.2d at 8; *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 105 (1st Cir.1988).

 The immunity afforded by § 85W is very similar to an affirmative defense in many respects and it is, therefore, appropriate to employ a burden-shifting paradigm. *Cf. Heinrich ex rel. Heinrich v. Sweet,* 118 F.Supp.2d 73, 86 (D.Mass.2000) (explaining burden shifting paradigm in context of the damages cap of M.G.L. ch. 231, § 85K), *vacated in part on other grounds,* 308 F.3d 48 (1st Cir.2002), *cert. denied,* 539 U.S. 914, 123 S.Ct. 2273, 156 L.Ed.2d 129 (2003).[10] A defendant bears the initial burden of production of establishing that he or she was an uncompensated trustee of BRMC sued for acts or omissions related to his or her duties as a trustee. If this burden is met, the plaintiff may either rebut that evidence or present evidence that an exception to the immunity applies. The burden of persuasion remains on the defendant to prove he or she is entitled to immunity.

There is no dispute that the Trustee Defendants have met their burdens of production and persuasion with regard to their status as uncompensated trustees and the general applicability of the statute. There is also no dispute that the acts and omissions of these defendants at issue do not arise out of the operation of an automobile. For the reasons described below, the Committee has not demonstrated a genuine issue of material fact as to any of the other three exceptions to the statute. Consequently, the Trustee Defendants are immune from damages and their motions for summary judgment are being allowed.

1. *The Uncompensated Trustee Defendants Did Not Commit Any Grossly Negligent Acts or Omissions That Resulted in Harm to the Person*

 The Committee has demonstrated that there is a genuine issue of material fact as to whether the Trustee defendants were grossly negligent. *See* Comm.'s 2003 Opp. at 33–36 (citing, among other things, expert report concluding that Trustee Defendants were grossly negligent). However, the statutory exception is limited to "grossly negligent acts or omissions which result in harm to the person". The parties disagree as to the meaning of this phrase.

The defendants argue that this exception to the immunity provided for in § 85W is limited to gross negligence that results in physical or emotional injury to a natural person. More specifically, they argue that any other interpretation would read the phrase "resulting in harm to the person" out of the statute and, "[u]nder the settled rules of statutory construction, each word in a statute must be given meaning." Case Defs.' Mem. at 12 (citing *Int'l Org. of Masters v. Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.,* 392 Mass. 811, 814, 467 N.E.2d 1331 (1984)).

The Case Defendants argue that "all [of] the reported cases interpreting G.L. c. 231,

---

**10.** *Keene v. Brigham & Women's Hospital, Inc.,* 439 Mass. 223, 238–39, 786 N.E.2d 824 (2003), decided after *Heinrich,* indicates that the limitation on liability and immunity provided by §§ 85K and 85W may not be true affirmative defenses despite the fact that they are treated as such for certain procedural purposes. In *Heinrich,* the court based its reasoning, in part, on the premise that "charitable immunity is an affirmative defense." *Heinrich,* 118 F.Supp.2d at 86. However, the court finds that *Heinrich* still describes the appropriate framework even if the immunity claimed by the defendants is not actually an affirmative defense.

Section 85W involve injury to a natural person, and not economic damage to creditors." Case Defs.' Mem. at 14–15 (citing six cases). The Case Defendants are correct that the plaintiffs in the six cited cases were all natural persons, but economic damages were alleged in two of them, *Nadal–Ginard v. Children's Hospital Corp.*, No. 94–3782–E, 1995 WL 1146118 (Mass Super. Ct. Dec. 1, 1995) and *Patriarca v. Center for Living & Working, Inc.*, No. 99–689–B, 1999 WL 791888 (Mass.Super.Ct. Sept. 8, 1999). In no case did a court hold that the gross negligence exception to § 85W's liability shield permitted recovery of economic damages. The Committee has not identified any case applying the exception to purely economic damages. The Case Defendants also cite cases interpreting the immunity conferred by M.G.L. ch. 231, § 85V, which also contains an exception for gross negligence to acts and omissions "which result in harm to the person" and note that none of these cases applies the exception to purely economic damages. Case Defs.' Mem. at 15.

Finally, the Case Defendants draw the court's attention to the federal loan-sharking statute, 18 U.S.C. § 891(7). Case Defs.' Mem. at 15. The statute defines "extortionate means" as "any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause *harm to the person*, reputation, or property *of any person*." (emphasis added). Thus, the Case Defendants argue that had the legislature desired a broader scope for the exception, it could have specified more types of harm in the statute.

The Committee does not dispute the fact that the damages that it alleges "were not in the nature of personal injuries to a natural person." Comm.'s Resp. to Def. Hogan's Stmt. of Material Facts ¶ 9; *accord* Comm.'s Resp. to Hughes Defs.' Stmt. of Material Facts ¶ 13. Rather, the Committee argues that the defendants are reading the exception too narrowly. Since this issue is one of statutory interpretation, it is a question of law for the court. *See* Comm.'s 2003 Opp. at 31 (citing *Annesse Elec. Svcs., Inc. v. Newton*, 431 Mass 463, 764 n. 2 (2000)); *accord* Hogan's Reply at 1.

Citing eleven Massachusetts statutes and one Supreme Judicial Court case from 1938, the Committee argues that "the ordinary and approved definition of 'person' includes entities." *Id.* At 31–32. The Committee also directs the court to Black's Law Dictionary, which defines "person" as "1. A human being. 2. An entity (such as a corporation) that is recognized by law as having the rights and duties of a human being." *Black's Law Dictionary* 1162 (7th ed.1999) (quoted in Comm.'s 2003 Opp. at 32). Finally the Committee argues that interpreting the statute as the defendants do leads to "absurd and unreasonable results" because no one, including the Attorney General, could ever sue the director or trustee of a charitable organization for breach of fiduciary duty unless there was physical bodily harm. Comm.'s 2003 Opp. at 33.

In her reply Hogan notes the "curious" fact that the Committee omitted the third part of the *Black's Law Dictionary* definition of "person" from its Opposition. The third part of the definition reads: "3. The living body of a human being <contraband found on the smuggler's person>." *Black's Law Dictionary* 1162 (7th ed.1999) (quoted in Hogan's Reply at 3). Hogan also reiterates her earlier argument that the statute uses the phrase "the person" as opposed to "a person" or "person" and this phrase is a term of art referring to a person's body. Hogan's Reply at 3; *accord* Case Defs.' Mem. at 15–16; Hughes Defs.' Reply at 10. Finally, she points the court to other Massachusetts statutes and

cases that interpret injuries or harm to the person to mean bodily injury or personal injury. Hogan's Reply at 4–5.

In their reply, the Hughes Defendants dispute the Committee's contention that limiting the gross negligence exception to harm to natural persons leads to absurd results. Hughes Defs.' Reply at 10–11. The Hughes Defendants argue that the result is quite rational because (1) the legislature wanted broad immunity for uncompensated directors of charities in order to encourage volunteerism; and (2) since compensated "directors are protected from liability to the corporation for mere negligence [and] gross negligence is required" to establish liability, the immunity statute would have added nothing to the protection afforded uncompensated directors if only a showing of gross negligence were required to defeat immunity. *Id.* at 11 (citing *Spiegel v. Beacon Participations*, 297 Mass. 398, 410–11, 8 N.E.2d 895 (1937) for the proposition that the liability of ordinary directors must be premised on gross negligence). The court also notes that even if damages are not available, an appropriate plaintiff could obtain injunctive relief against an uncompensated director.

Ultimately, the court finds the defendants' arguments persuasive. If the legislature did not intend to limit immunity for damages arising out of gross negligence to those acts and omissions that cause harm to a natural person, then there would be no reason to include the phrase "which result in harm to the person" in the statute. The legislature could have said "any grossly negligent acts or omissions" or "any grossly negligent acts or omissions which result in harm". The phrase "to the person" must be attributed some significance. As the First Circuit wrote in *United States v. Cortes–Claudio*, 312 F.3d 17, 21–22 (2002) (quoting *Duncan v. Walker*, 533 U.S. 167, 174, 121 S.Ct. 2120, 150

L.Ed.2d 251 (2001) (internal quotation marks omitted)), "[i]t is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.' " The plaintiff's proffered interpretation of the statute strips part of the statute of any significance and the court must, therefore, reject it.

### 2. *The Activities of the Uncompensated Trustee Defendants That the Committee Alleges Constitute Breaches of Fiduciary Duty Were Not Primarily Commercial in Nature*

■ In arguing over the scope of the primarily commercial in nature exception, both the Committee and the defendants urge the court to look at interpretations of similar language in M.G.L. § 85K, which establishes the charitable immunity cap, and adopt a test that requires an activity to be "entirely disconnected" from the charity's purpose for it to fall within the exception. Comm.'s Mem. at 38; Hogan Mem. at 12–13; Case Defs.' Mem. at 16–17; Hughes Defs.' Mem. at 6–7. The court agrees that this analogy is appropriate. *Cf. Crocker v. Wakefield Little League Ass'n, Inc.*, No. 97–4725, 1999 WL 1318990, at *2 (Mass.Super.Ct. Apr. 27, 1999) (looking to cases construing § 85K in determining scope of exception in § 85V providing immunity for sports organizations because no cases construing § 85V were available).

However, it is now unclear whether the "entirely disconnected" test remains the relevant inquiry for determining the applicability of § 85K's liability cap. In *Conners v. Northeast Hospital Corp.*, 439 Mass. 469, 478–80, 789 N.E.2d 129 (2003) (footnote omitted), a case decided after briefing and oral argument in this case, Chief Justice Margaret Marshall wrote:

Relying on *Missett v. Cardinal Cushing High Sch.*, 43 Mass.App.Ct. 5, 680 N.E.2d 563 (1997), the judge concluded that Northeast's snow removal activities were not "primarily commercial" in nature because Northeast did not derive any revenue from the snow removal operations, was not operating a "full-fledged" snow removal business, and was not engaged in an activity that was "entirely disconnected" from the charity's purpose. *Id.* at 11, 680 N.E.2d 563. We agree with the judge's conclusion, but for somewhat different reasons.

To determine whether the statutory limitation on liability applies in a given case, Conners elevates the "primarily commercial" analysis of § 85K's second sentence to a separate test, independent of the "accomplished directly" analysis set forth in the first sentence. The two considerations denoted in the statute are not independent. Having determined, correctly, that the hospital's activity challenged by Conners "accomplished directly" the charitable purposes of Northeast, it was not necessary for the judge to consider whether those activities were "primarily commercial in character." We reach this conclusion by parsing and construing each phrase of § 85K so that each word is "given its ordinary meaning without overemphasizing its effect upon the other terms appearing in the statute, so that the enactment considered as a whole shall constitute a consistent and harmonious statutory provision capable of effectuating the presumed intention of the Legislature." *Globe Newspaper Co. v. Commissioner of Educ.*, 439 Mass. 124, 129, 786 N.E.2d 328 (2003), quoting *Bolster v. Commissioner of Corps. & Taxation*, 319 Mass. 81, 84–85, 64 N.E.2d 645 (1946).

The first clause of the first sentence of § 85K abolishes charitable immunity, and is not at issue here. The second clause of the first sentence then qualifies the abrogation of charitable immunity by limiting the liability for tort damages to only those activities that "accomplish directly the charitable purposes." G.L. c. 231, § 85K. If a charity's activity does so, which is a question of fact, the activity, ipso facto, is subject to the limitation on liability. No further inquiry is necessary.

The second sentence of § 85K ("primarily commercial") clarifies the Legislature's intent in circumstances where the questioned activity of a charity is one that generates revenue: that sentence directs the fact finder to consider, among other things, whether the activity is a money-making enterprise merely designed to keep the charity afloat, in which case the limitation does not apply, or whether the revenue is generated by an activity accomplishing the purpose of the charity. *See, e.g., Phipps v. Aptucxet Post #5988 V.F.W. Bldg. Ass'n*, 7 Mass.App.Ct. 928, 930, 389 N.E.2d 1042 (1979) (no limitation on damages where tort committed in course of regular weekend dance opened to general public that generated bulk of charity's general operating revenue). Thus, a charitable organization may not avail itself of the limitation by claiming that its revenue-generating activity has a general salutary effect. *See McKay v. Morgan Memorial Coop. Indus. & Stores, Inc.*, 272 Mass. 121, 123, 125–126, 172 N.E. 68 (1930) (not enough that revenue generating activity provided "general uplift" to people in difficult circumstances where activity itself did not carry out "charitable objects" of extending relief to poor and giving religious instruction). If the revenue-generating activity is indeed "primarily commercial," it cannot "accomplish directly" the charitable work of the organization. Conversely, a revenue-generating activity may, and in many circumstances does, "accomplish

directly" the organization's purpose. *See Grueninger v. President & Fellows of Harvard College,* 343 Mass. 338, 340, 178 N.E.2d 917 (1961) (charitable corporation not liable for activities that "incidentally yield revenue"); *Missett v. Cardinal Cushing High Sch.,* supra at 11, 680 N.E.2d 563 ("Generating revenue does not alone mean that an activity is 'primarily commercial' "). The "critical question" is whether the revenue-generating activity is "in conformity with the [corporation's] . . . charitable corporate purposes." *Mason v. Southern New England Conference Ass'n of Seventh–Day Adventists,* 696 F.2d 135, 140 (1st Cir.1982).

 Thus, the "entirely disconnected" test set forth by the Appeals Court in *Missett* and approved by the Supreme Judicial Court in *Linkage Corp. v. Trustees of Boston University,* 425 Mass. 1, 28 n. 37, 679 N.E.2d 191 (1997) may have been supplanted, or at least been supplemented, by the "accomplish directly" standard articulated in *Conners.* Regardless of the appropriate formulation of the governing standard, the court concludes that, consonant with the purposes of providing a broad shield from liability for uncompensated trustees of charitable institutions in order to encourage volunteerism, the "primarily commercial activity" exception to § 85W should be construed narrowly.

The Trustee Defendants persuasively argue that they were not trying to run a business separate and apart from the hospital and, therefore, their activities were not entirely disconnected from the charitable purpose of BRMC. As Hogan puts it "[t]he Committee cannot explain how or why the ordinary actions of the trustees of a non-profit corporation could be 'entirely disconnected' from the purposes of the corporation. To the contrary, the alleged acts and omissions of the Defendants in connection with BRMC's finances are entirely

connected to the charitable purpose of BRMC, since a hospital can only fulfill its purpose if its board of trustees performs its function." Hogan Mem. at 14 (emphasis in original). Put another way, by serving as trustees, the defendants helped BRMC accomplish directly its charitable purpose rather than some other goal that was commercial in nature. Thus, under either formulation of the standard, the defendants are entitled to immunity from damages. A review of the cases interpreting § 85K supports to this conclusion.

In *Missett,* the Massachusetts Appeals Court held that a teenager stabbed at a school dance open to non-students for which admission was charged could not recover damages beyond the cap of § 85K because "whether the educational benefits of the dance are 'indirect' rather than 'direct' is not determinative; that some educational benefits resulted from the students' organizing, advertising, running, and participating in the dance is enough under § 85K to conclude that the dance accomplished directly the charitable purposes of the school." *Id.* at 10, 680 N.E.2d 563. The court cited with approval the First Circuit's decision in *Mason v. Southern New England Conference Assn. of Seventh–Day Adventists,* 696 F.2d 135, 139 (1st Cir.1982) for the proposition that "cases in which courts have concluded that an activity was 'primarily commercial' have involved the operation of full-fledged businesses." *Id.* at 11, 680 N.E.2d 563. The court distinguished *Phipps v. Aptucxet Post # 5988 V.F.W. Bldg. Ass'n, Inc.,* 7 Mass.App.Ct. 928, 930, 389 N.E.2d 1042 (1979), another case involving dances, because in *Phipps,* the dances were regularly scheduled affairs that generated over 85% of the defendant's income, which was used to pay mortgage and overhead expenses. *Id.* at 11 n. 11, 389 N.E.2d 1042.

In *Jiminez v. Carribean Cultural Center, Inc.,* No. 95–03269, 1999 WL 1411349,

at *1–*2 (Mass.Super.Ct. Dec. 18, 1999), the court held that a charitable organization whose purpose included "fostering awareness of the Caribbean cultural heritage in the Greater Boston Community" was not engaged in primarily commercial activity when it held a series of reggae events that generated substantial revenues that amounted to 70% to 80% of the organization's revenues. Distinguishing *Phipps*, the court reasoned that promoting appreciation of reggae music was part of the charitable purpose of promoting the Caribbean cultural heritage and, therefore, the damages cap applied.

In *Weintraub v. Metropolitan Center, Inc.*, No. 85–0210–Y, 1987 WL 7746, at *1–*2 (D.Mass. Feb.23, 1987), the court, following the reasoning of an earlier district court case, held that the Boston Opera Association was entitled to the liability cap when a violinist intending to perform at one of the Association's concerts injured his hand "while ... ascending into the orchestra pit" despite the fact that the Association charged for admission to the concert.

In *Harlow v. Chin*, 405 Mass. 697, 715–16, 545 N.E.2d 602 (1989), the Supreme Judicial Court held that a nonprofit hospital is entitled to the damages cap of § 85K so long as the actions complained of are to further its charitable purpose rather than "merely to generate revenue." *Id.* at 715, 545 N.E.2d 602.

■ Although BRMC was a business, it was not a business existing separately from the charity's purpose. According to its Articles of Organization, BRMC has several purposes. They include: (1) "founding a hospital or charitable asylum within the State of Massachusetts"; (2) "the care and relief of indigent or other sick or infirm persons ...."; (3) "to aid and assist [AAHC] in furtherance of its charitable and corporate purposes, includ-

ing operation and harmony with the standards, goals and methods established by the Seventh-day Adventist Church"; (4) distributing assets to Church affiliates once creditors are paid in the event of dissolution or liquidation; and (5) "to engage in educational activities for the benefit of the community served by the Corporation." Bennett Aff. Ex. 3. BRMC's articles of organization are *prima facie* evidence of its charitable purposes. *See Boxer v. Boston Symphony Orchestra, Inc.*, 342 Mass. 537, 538, 174 N.E.2d 363 (1961). To the extent that the Trustees were overseeing BRMC's operations, they were acting to further the core charitable purposes of the organization rather than for some other commercial purpose. The cases, particularly *Jiminez* and *Weintraub*, illustrate that even revenue-generating enterprises are not "primarily commercial in character" so long as they are related to the charitable purpose of the organization.

The Committee argues that:

> In their arguments, the Defendants confuse the entity that the BRMC Board was bound to serve. The Defendants argue that because the DCHC offer would preserve the unrelated Adventist church and school located on BRMC's property, the Board was acting within BRMC's charitable purpose. However, if consummated, the DCHC transaction would have resulted in the conversion of BRMC to a for-profit institution. The crux of the proposed DCHC transaction was the cessation of BRMC's charitable purpose. Hence, any acts or omissions of BRMC's Board relating to the sale of BRMC fall squarely within the commercial transaction exception in the immunity statute.

Comm.'s Mem. at 39.

This argument is not persuasive for the reasons described by the Hughes Defendants in their Reply. As they state:

To be sure, the primary purpose of BRMC at its founding was the operation of a hospital. But the articles and amended articles make it clear that the charitable purpose encompassed (i) providing healthcare to the community, (ii) forwarding the education of the community, (iii) assisting AAHC in accomplishing its charitable purpose. CredComm Exh. 3.

Contrary to the CredComm's assertion, the transaction at issue would not turn BRMC into a for-profit organization. The *hospital* would have been converted into a for-profit operation; but that is not the same as turning BRMC into one. Further, the DCHC transaction, had it succeeded, would have had the following effects that were within its charitable purposes:

* The hospital would have been preserved, and the entity that owned it would itself have been owned 80% by DCHC and 20% by AAHC. CredComm Exh.s 9, 12. As a result, by preserving the hospital in operation, BRMC would have (i) fulfilled the charitable purpose of keeping health care available through the hospital, and (ii) fulfilled the charitable purpose of assisting AAHC in its charitable purposes by allowing AAHC to retain some interest in the hospital;

* BRMC itself would have been able to remain in existence as a charitable corporation rather than facing compelled liquidation;

* The charitable purpose of ensuring that on liquidation and payment of debts assets could be distributed to organizations with affiliations with the Seventh–Day Adventist church would be preserved; and

* The school and the church properties would be preserved for uses within the scope of BRMC's charitable purposes.

The DCHC transaction, therefore, was not "entirely disconnected" from the charitable purposes of BRMC, and the immunity statute applies to the Moving Defendants.

Hughes Defs.' Reply at 12–13 (emphasis in original).

Furthermore, the Committee's allegations are not limited to the DCHC transaction. Rather, the Committee alleges a broader pattern of mismanagement that includes within its scope acts of the Trustee Defendants other than approving the asset purchase agreement with DCHC. *See, e.g.,* Apr. 23, 2003 Tr. at 38–40. These are all actions that directly accomplished BRMC's charitable goals.

3. *The Committee Has Failed to Establish a Genuine Issue of Material Fact as to Whether the Uncompensated Trustee Defendants Committed Acts Intentionally Designed to Harm BRMC or its Creditors*

 The Committee concedes that neither Hogan nor the Hughes Defendants committed any acts intentionally designed to harm BRMC. *See* Comm.'s Resp. to Hughes Defs.' Stmt. of Material Facts ¶ 12; Comm.'s Resp. to Hogan's Stmt. of Material Facts ¶ 8. Accordingly, this final exception does not apply to them and they are entitled to immunity and, therefore, summary judgment.

With regard to the Case Defendants, however, the Committee argues that they are not entitled to immunity because their actions were intentionally designed to harm BRMC and its creditors. *See* Comm.'s 2003 Opp. at 36–38. Generally, the Committee alleges that the Case Defendants, who were also members of AAHC's Board, made decisions to harm BRMC in order to benefit AAHC and other Adventist entities.

The Case Defendants claim that "[t]he only intentional acts ascribed to [them] by the Plaintiff was their neglect of their fiduciary duty with respect to the overall governance of BRMC by permitting the officers of BRMC to make general decisions with respect to the general management of BRMC particularly with respect to BRMC's efforts to obtain a financially viable partner." Case Defs.' Stmt. of Facts ¶ 16. The Committee denied this statement of fact, claiming that the Case Defendants "intentionally neglected their fiduciary duties as trustees with respect to the overall governance of BRMC." Comm.'s Resp. to Case Defs.' Stmt. of Facts ¶ 16. At various points in its filings, the Committee expands on this allegation by identifying particular events that it asserts were intentionally designed to harm BRMC. See Comm.'s 2003 Opp. at 36 (deciding to accept the DCHC offer); *id.* at 38 ("disavowing their clear conflicts of interest and [failing to] tak[e] appropriate remedial measures"). However, ultimately the Committee's allegations of intentional conduct on the part of the Case Defendants "is premised upon omission, as opposed to commission." Comm.'s Answer to Case Defs.' Int. No. 3 (Nickless Aff. Ex. A at 4).

The evidence supporting the allegations of intentional harm is sparse. The Committee "admits that its expert, Anthony Kovner, did not conclude in his report that the Defendants conducted any intentional acts designed to harm." Comm.'s Resp. to Case Defs.' Stmt. of Facts ¶ 20.[11] "However, by way of further response, [the Committee claims that] minutes from the Board meetings and deposition testimony support that Defendants intentionally sacrificed BRMC for the benefit of unrelated Adventist entities. See Committee Ex. 7."

*Id.* The Committee does not cite any particular depositions in its Response to the Case Defendants' Statement of Facts. *See* Local Rule 56.1 (requiring "page references to affidavits, depositions and other documentation" in an opposition to a motion for summary judgment). The exhibit to which the Committee refers is the minutes of an AAHC Board Meeting in which the AAHC board members discussed the DCHC transaction. Acknowledging the delays and other issues that plagued the DCHC transaction, the minutes reflect that "it should be noted that the transaction will have allowed us to subdivide the properties and protect the other assets of AAHC." The Committee treats this document as the smoking gun in which AAHC and its directors acknowledge that any problems with the DCHC transaction with BRMC were viewed as minor in light of the benefits that AAHC, as opposed to BRMC, would receive as a result of the transaction. *See* Apr. 23, 2003 Tr. at 83.

The Case Defendants note that "[s]ummary judgment is appropriate, even where 'elusive concepts such as motive or intent are at issue...if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" Case Defs.' Reply at 8 (quoting *Lehman v. Prudential Ins. Co. of Am.*, 74 F.3d 323, 327 (1st Cir.1996)) (ellipses in original). They then correctly identify the definition of acts "intentionally designed to harm" under Massachusetts law and argue persuasively that the Committee cannot prove that they acted with the requisite level of intent.

Revealed through the lens of liberal construction would be Massachusetts law's recognition of the difference be-

---

**11.** Moreover, it is not clear that Kovner is qualified to give admissible testimony about the mental state of the defendants. *See* Fed. R.Evid. 701, 702. In deciding the motions for summary judgment, the court must limit its consideration to admissible evidence. *See* Fed.R.Civ.P. 56(e).

tween the intention to commit an act which involves a high degree of likelihood that substantial harm may result to another (reckless misconduct) and the intention to cause that harm (intentional misconduct). The Restatement of Torts has usefully delineated that distinction:

"Intentional misconduct and recklessness contrasted. Reckless misconduct differs from intentional wrongdoing in a very important particular. While an act to be reckless must be intended by the actor, the actor does not intend to cause the harm which results from it. It is enough that he realizes or, from facts which he knows, should realize that there is a strong probability that harm may result, even though he hopes or even expects that his conduct will prove harmless. However, a strong probability is a different thing from the substantial certainty without which he cannot be said to intend the harm in which his act results."

Restatement (Second) of Torts § 500 comment f (1964). *See Commonwealth v. Welansky*, 316 Mass. at 399, 55 N.E.2d 902; *Sheehan v. Goriansky*, 321 Mass. 200, 204, 72 N.E.2d 538 (1947). *See also* Restatement (Second) of Torts § 8A comment b; Prosser & Keeton, Torts § 8, at 36, & § 34, at 212 (5th ed.1984).

Most pertinently, the distinction between an "intentional tort" and "willful" wrongdoing is reflected in the Massachusetts Tort Claims Act itself. See G.L. c. 258, § 9. It is a discrimination that is consistent with legislative practice. In creating and modifying liabilities and immunities, the Legislature has been differentially precise in specifying when it wanted standards of liability to be based on "intentional" conduct, *see* G.L. c. 231, §§ 85S(c), 85V, & 85W, rather than on "wilful, wanton or reckless" conduct, as in §§ 85K, 85R, & 85T; or

on "gross negligence" (§§ 85V & 85W); or on "ordinary negligence" (§ 85L). *Forbush v. City of Lynn*, 35 Mass.App.Ct. 696, 700–01, 625 N.E.2d 1370 (1994).

After examining the record in the light most favorable to the Committee and indulging all inferences favorable to the Committee, the court concludes that no reasonable jury could find that the Case Defendants committed acts intentionally designed to harm BRMC or its creditors. Gross negligence differs "in kind from wilful and intentional conduct." *Altman v. Aronson*, 231 Mass. 588, 592, 121 N.E. 505 (1919) (quoted in *Christopher v. Father's Huddle Café, Inc.*, 57 Mass.App.Ct. 217, 230–31, 782 N.E.2d 517 (2003)). The evidence is insufficient to support a jury finding that the Case Defendants intentionally sought to harm BRMC. The Committee points to no evidence at all that indicates that the Case Defendants wanted the DCHC transaction to fail or BRMC to become insolvent. At most, the Committee would be able to prove that the Case Defendants were grossly negligent and their conflicts of interest served to encourage them to allow BRMC to engage in unreasonably risky behavior.

The minutes of the AAHC Board Meeting cannot support an inference to the contrary. The minutes contain statements relating to the potential risks and rewards presented by the DCHC transaction. The minutes do not contain any statements indicating that the Case defendants intended that the risks would materialize and the transaction fail. Thus, the minutes would support a jury conclusion that the Case Defendants pursued the DCHC transaction despite "the high degree of likelihood that substantial harm may result to [BRMC] (reckless misconduct)," but not the conclusion that the Case Defendants had "the intention to cause that harm (intentional misconduct)." *Forbush, supra.*

As the final exception does not apply to the Case Defendants, they too are entitled to immunity and, therefore, summary judgment.

### E. NEITHER RICKS NOR CRUNK IS ENTITLED TO JUDGMENT ON THE PLEADINGS

For the reasons described in Parts IV.A and IV.B, *supra*, Ricks and Crunks' arguments that this court lacks subject matter jurisdiction, that only the Attorney General has standing to bring this action and that the Committee has failed to join an indispensable party, the Attorney General, in violation of Rule 19 are without merit. Accordingly, Ricks and Crunks' motions for judgment on the pleadings are being denied.

Crunk also argued that she is entitled to judgment on the pleadings because an officer of a nonprofit corporation cannot be held liable for acts and omissions relating to the sale of substantially all of the corporation's assets if the sale has been approved by the Board of Trustees. *See* Crunk's Mem. at 17–19; Crunk's Reply at 15–16. However, this issue was not identified in the court's February 4, 2003 Order as one of the arguments on which a party may base a motion for summary judgment or judgment on the pleadings at this stage in the proceedings. Accordingly, the court is not now addressing this contention. Crunk may raise this argument again at an appropriate time, and the plaintiff will have an opportunity to respond. *See Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11, 21 (1st Cir. 2004) ("District courts have broad discretion in determining the sequence of their rulings.").

Ricks and Crunk both received compensation as officers of BRMC. Accordingly, as compensated officers, they are not protected by the immunity conferred by M.G.L. ch. 231, § 85W. During the April 23, 2003 hearing, counsel for Ricks made an oral motion seeking summary judgment in Ricks' capacity as an unpaid trustee, as opposed to his capacity as a paid officer. Apr. 23, 2003 Tr. at 54–55. The parties have not had an opportunity to brief this issue and, as the motion was made orally, Ricks did not comply with Local Rule 56.1. The court questions whether resolving this issue will make any real difference for the parties and will not now rule on Ricks' motion. However, the court notes that the immunity conferred by M.G.L. ch. 231, § 85W extends only to "acts or omissions relating solely to the performance of his duties as a[ ] ... trustee." In this case, it may be difficult to separate Ricks' actions as president from his actions as trustee. If that is the case, then the acts and omissions alleged by the Committee do not relate *solely* to Ricks' service as an uncompensated trustee, and it would appear that he is not entitled to immunity under § 85W.

### V. ORDER

Accordingly, it is hereby ORDERED that:

1. Plaintiff Official Committee of Unsecured Creditors of Boston Regional Medical Center's Bankruptcy Estate's Motion to Strike (Docket No. 157) is ALLOWED.

2. Defendant Atlantic Adventist Healthcare Corporation's Motion for Judgment on the Pleadings (Docket No. 73) is ALLOWED in part and DENIED in part. The Clerk shall enter judgment for Atlantic Adventist Healthcare Corporation on its Counterclaim. The court DECLARES that any liability of Atlantic Adventist Healthcare Corporation on Count IV of the Complaint to the Boston Regional Medical Center Bankruptcy Estate or the Estate's Official Committee of Unsecured Creditors is limited to the sum of $20,000 exclusive of interest and costs. *See*

M.G.L. ch. 231, § 85K. Atlantic Adventist Healthcare Corporation's Motion for Judgment on the Pleadings is DENIED as it relates to Count IV of the Complaint.

3. Defendant Laura Hogan's Motion for Summary Judgment (Docket No. 103) is ALLOWED.

4. Defendants Jon Asgeirsson, Mark Hughes, Randy Lapides, Robert Leone, Jose Marcal, Kim O'Neil, and Paul Raslavicus' Motion for Summary Judgment (Docket No. 106) is ALLOWED.

5. Defendants Charles Case, Harold Grayson, Theodore Jones, Leon Thomassian and Halvard Thomsen's Motion for Summary Judgment (Docket No. 116) is ALLOWED.

6. Defendant Charles Ricks' Motion for Judgment on the Pleadings (Docket No. 113) is DENIED.

7. Defendant Frances Crunk's Motion for Judgment on the Pleadings (Docket No. 114) is DENIED.

8. Plaintiff Official Committee of Unsecured Creditors of Boston Regional Medical Center's Bankruptcy Estate shall, by September 17, 2004, submit an affidavit, documents and any other evidence that it asserts establishes that plaintiff has been assigned BRMC's claims against the defendants in this case or file a motion seeking to substitute as plaintiff Reorganized BRMC. In either event, plaintiff shall file a supporting memorandum. The remaining defendants shall, by October 1, 2004, respond to plaintiff's submission.

9. The parties shall confer to discuss settlement and scheduling. They shall, by October 1, 2004, report on settlement, and, if they have not agreed on a settlement, identify all outstanding issues to be litigated and propose a schedule for the remainder of this case, jointly if possible.

10. A hearing and/or scheduling conference will be held on October 15, 2004 at 11:00 a.m.

11. The Clerk shall send a copy of this Memorandum and Order to counsel for the plaintiff in *Executive Risk Indemnity, Inc. v. Asgeirsson et al.*, C.A. No. 01–12167–MLW.